DAVID G. YUKIMURA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Yukimura v. Commissioner
Docket No. 10704-80.
United States Tax Court
T.C. Memo 1982-58; 1982 Tax Ct. Memo LEXIS 682; 43 T.C.M. (CCH) 467; T.C.M. (RIA) 82058; February 10, 1982; Revised March 17, 1982 David G. Yukimura, pro se. Henry E. O'Neill, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in the amount of $ 596 in petitioner's Federal income tax for 1977 and an addition to tax in the amount of $ 29.80 under section 6653(a). [1] The sole issue for decision is the amount of tip income received but not *683 reported by petitioner. [2]
FINDINGS OF FACT At the time his petition was filed, petitioner David G. Yukimura resided in Lihue, Hawaii. He timely filed a Federal income tax return for 1977. During 1977, petitioner was employed as a busboy working at the Coco Palms Hotel (the hotel), located on the Island of Kauai, Hawaii. He worked the evening shift *684 in the hotel's two dining rooms, the Lagoon Room and the Flame Room. The Lagoon Room was the main dining room, in which a dinner show was presented and which generally handled more business than did the much smaller Flame Room. During 1977, petitioner worked a total of 695 hours in the Lagoon Room and 524.5 regular hours in the Flame Room. Busboys working at the hotel were compensated by base wages plus tips; tips were received in two distinct ways: from the hotel through wage paychecks and from the waiters in currency. [3] The hotel management collected tips directly and paid them from the payroll account to employees for certain activities such as banquets and special functions, group tours operating on an American Plan or a Modified American Plan, and large "drop-in" dinner groups. For banquets and similar functions, the hotel included a gratuity charge of which it retained 15 percent and split the remaining 85 percent equally among the employees working the function. For tours and large "drop-in" groups, a 15-percent gratuity charge on meals was included in the hotel's charge and was paid directly to employees out of the hotel's payroll account. Approximately 5 to 8 percent *685 of the hotel's sales were attributable to group tours and approximately 10 to 15 percent to large drop-in dinner groups. The hotel did not hold very many banquets or other special functions. Petitioner's exact working conditions varied. On different nights he worked for one, for two, or for three waiters. Petitioner worked in the dining rooms for three waiters approximately 30 percent of the time, for two waiters approximately 55 to 60 percent, and for one waiter 10 to 15 percent of the time. Busboys' duties also included providing room service for hotel guests. Petitioner had this assignment on an average of one day a week. Although busboys handling room service signed in for the main dining room, their duties were entirely distinct from the dining room activities and they received no waiters' tips. Rather, for 6 hours of room service duty they received approximately $ 4 to $ 6 per night. For 1977, petitioner reported on his income tax return $ 1,266.16 received as tips. All of this amount was comprised of tips collected by the hotel for functions, tours, and groups, *686 and paid to him out of the payroll account. He reported no income from tips paid to him by waiters.
Respondent determined that petitioner received unreported tips from waiters in the amount of $ 3,420.11. In so determining, respondent relied on a method whereby he sought to determine the busboys' tip rate per hour; multiplying this hourly rate by the number of hours petitioner worked was determined to reflect the amount of petitioner's total tip income, from which was subtracted his reported tip income. The method used by respondent was comprised of two major steps.The first step was designed to determine the total tips received by all waiters and the second to calculate the amount of waiters' tips actually received by petitioner. To determine the total tips received by waiters, respondent first calculated separately the waiters' average tip rates for the Flame and Lagoon Rooms. These rates were derived by calculating the ratio of total tips to gross sales as set forth in sampled charge sales on randomly selected dates in 1977. [4] Respondent's examining agent eliminated from the study all charge sales receipts with tips equaling or exceeding 50 percent of the sales totals. *687 The ratio of the analyzed charge tips to charge sales was 13.9627 percent for the Lagoon Room and 14.657 percent for the Flame Room. This ratio was then multiplied by the year's "adjusted sales" (gross sales less 10 percent to reflect sales to nontippers) to arrive at the total tips received by all waiters. With this figure on the waiters' tip receipts, respondent moved to his second step, that of determining petitioner's unreported busboy tips. This was done by calculating the busboys' tip rate per hour in each room, and multiplying it by the number of hours petitioner worked in that room. According to respondent's calculations, all Lagoon Room waiters paid busboys 35 percent of their total tip income and all Flame Room waiters paid busboys 30 percent of their total tip income.The total busboy income was computed by applying those percentages. Dividing the total busboy tips by total busboy hours of work, respondent arrived at an hourly tip rate to busboys of $ 3.46 for the Lagoon Room and $ 4.35 for the Flame Room. This hourly rate was *688 then multiplied by the hours petitioner worked in each room (695 in the Lagoon Room and 524.5 in the Flame Room). On this basis, respondent determined that petitioner had $ 4,686.27 of total tip income ($ 2,404.70 from the Lagoon Room plus $ 2,281.57 from the Flame Room), of which $ 3,420.11 was unreported. [5]
*689 OPINION Petitioner concedes that he received some unreported tip income but challenges respondent's determination of the total amount received. He estimates that his unreported income was approximately 45 percent of respondent's determination and that the rate of his tip income was approximately $ 2.40 per hour. [6]
Because petitioner failed to maintain adequate records, [7] respondent argues that he is authorized by section 446 to compute petitioner's tips for 1977 in accordance with a method which, in his opinion, clearly reflects such income. . The use of a formula approach similar to the one used by respondent has been sanctioned by this Court, see, e.g., , and petitioner *690 bears the burden of proving error in respondent's determination. ; Rule 142(a). We think, and petitioner agrees, that a formula approach can properly be used in this case, but we have concluded that respondent's formula does not accurately reflect petitioner's income because of two faulty assumptions. First, respondent calculated the waiters' tip rates from figures derived exclusively from charge sales. Petitioner argues that credit card charge customers do not constitute a fair sampling for a statistical formula because they do not form a majority of the restaurant's customers. Also, petitioner argues that *691 because cardholders generally have a higher financial status than noncardholders, they tend to tip more than noncardholders. While we have no specific statistical evidence concerning relative tip percentages of charge and noncharge customers, we accept petitioner's position that, in general, charged tip percentages tend to exceed noncharged tip percentages. [8] Therefore, in the light of all the testimony, we think a more reasonable tip percentage would be 13.5 percent for the Lagoon Room and 14 percent for the Flame Room. [9], affg. in part and revg. in part . *692 The more serious inaccuracy we perceive in respondent's method concerns the percentage of tips to busboys from waiters. Petitioner testified that, regardless of the number of waiters served by one busboy, each waiter would give the busboy 15 percent of his tips, except for two "better waiters," who each gave the busboys approximately 30 percent of his tips. Respondent, on the other hand, estimated that of the total tips received by waiters, 30 or 35 percent, depending on the dining room, was given to busboys. [10] He provided no explanation for this figure. While petitioner bears the burden of proving that respondent erred, , Rule 142(a), we think petitioner has produced sufficient evidence to show that these percentages are excessive. Respondent apparently based these 30 and 35-percent figures on the assumption that waiters do not invariably tip 15 percent, as petitioner testified, but that the percentage fluctuates with the number of waiters serviced by each busboy. Respondent argues that the more waiters per busboy, the *693 less each individual waiter tipped; and, conversely, when only one or two waiters shared a busboy, they would tip him more to promote a "team" effort.
While this conjecture seems perhaps plausible, it stands in direct contradiction of petitioner's testimony that all waiters, save two, tipped at 15 percent. Respondent hypothesized but petitioner testified. Respondent's reasoning is based upon no evidence but upon what is described as "logic," while petitioner, whom we found to be a credible witness, testified from his experience. [11] Petitioner has carried his burden of showing that respondent erred in determining that waiters tipped at 30 or 35 percent, depending on the dining room in which they worked. Because petitioner testified that two of the "better waiters" tipped at 30 percent, [12] we raise the waiters' tipping percentage, as a basis for making the required determination, to 22 percent. *694 Respondent attempts to undermine petitioner's credibility by attacking his approximation of percentages of time he worked for one, two, or three waiters by comparing the total busboy hours with total waiter hours. These comparisons, respondent asserts, suggest a closer working relationship between waiter and busboy (the Lagoon Room's ratio being "approximately" 1:1 and the Flame Room's 1.5:1), and these ratios, under respondent's "team" theory, allegedly support his higher figures of 30 and 35 percent. We find this argument unpersuasive. Initially, we note that petitioner estimated his own busboy/waiter ratio and did not estimate the overall ratio. In addition, the total busboy hours in the Lagoon Room included the hours busboys worked on room service, thus artificially inflating the busboy/waiter ratio. The record is silent as to the number of busboys in comparison to waiters working each night. Moreover, there is no evidence showing that busboys and waiters worked identical schedules as respondent's simple comparison of total hours may assume: [13] some busboys may have stayed longer each night than waiters to put the dining room in order for the next day. We do not think *695 that the scanty evidence we have supports a negative inference as to petitioner's credibility. We hold, then, that respondent correctly determined that petitioner underreported his income but that the amount of this omission, as well as the amount of conceded additions to tax, must be redetermined in light of the foregoing. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted. All "Rules" references are to the Tax Court Rules of Practice and Procedure. Respondent also determined that petitioner was liable for FICA taxes of $ 200.07 under sec. 3101 and an addition to tax of $ 100.03 under sec. 6652(c), but this Court does not have jurisdiction over those determinations. See ; Rule 13. ↩
2. Petitioner appears to concede his liability for the sec. 6653(a) addition to tax. He admitted at trial that he did not report some tip income and stated in his answering brief that he "will pay the tax and the penalty for this tip income"; he contests only respondent's determination of the amount of unreported income.↩
3. The term "waiters" will apply to waiters and waitresses, and "busboys" will include busgirls.↩
4. The Internal Revenue Service examining agent sampled charge sales in the Lagoon Room on 28 dates and in the Flame Room on 22 dates.↩
5. Respondent's determinations were computed as follows: Lagoon Room
(a) Sales analyzed
$ 33,663.00 (b) Tips on analyzed sales
$ 4,700.00 (c) Ratio of tips to sales (b/a)
13,9627% (d) Gross sales for the year
$ 1,175,187.00 (e) Less - 10% to reflect sales to nontippers
($ 117,519.00)
(f) Adjusted sales
$ 1,057,668.00 (g) Tip percentage
13.9627% (h) Total tips received for the year by
waiters/waitresses (f X g)
$ 147,679.00 (i) 35% tips to busboys by waiters/waitresses
$ 51,688.00 (j) Tips received from waiters/waitresses
$ 51,688.00 (k) Total hours worked by busboys
14,936.00 (l) Tip rate per hour (j/k)
$ 3.46 Flame Room↩
(a) Sales analyzed
$ 5,406.00
(b) Tips on analyzed sales
$ 792.00
(c) Ratio of tips to sales (b/a)
14.657%
(d) Gross sales for the year
$ 288,137.00
(e) Less - 10% to reflect sales to nontippers
$ 28,814.00
(f) Adjusted sales
$ 259,323.00
(g) Tip percentage
14.657%
(h) Total tips received for the year by waiters/
waitresses (f X g)
$ 38,009.00
(i) 30% tips to busboys by waiters/waitresses
$ 11,403.00
(j) Tips received from waiters/waitresses
$ 11,403.00
(k) Total hours worked by busboys
$ 2,622.00
(l) Tip rate per hour (j/k)
$ 4.35
6. These estimates produce different results; 45 percent of respondent's estimated unreported tips of $ 3,420.11 is $ 1,539.05, while 1,219.5 hours worked at $ 2.40 per hour is $ 2,926.80. If this $ 2.40 per hour figure covers all of petitioner's tip income--reported and unreported--then this estimate results in omitted income of $ 1,660.64 ( $ 2,926.80 minus $ 1,266.16). ↩
7. Petitioner offered in evidence a sheet containing figures purporting to be tips for the first 3 months of 1977. He testified that he drew up this sheet "several months ago," after he had been asked for information. In compiling the figures, he relied on "scrap paper" on which he had allegedly totaled his estimated tips. Because this record covered only part of 1977 and as its reliability is far from established, we accord it little weight. We think that respondent justifiably resorted to a formula method.↩
8. See . ↩
9. The total sales figure includes sales from functions, tours, and large parties. The record is not clear as to the exact percentage of such sales actually received by waiters and by busboys. It is stipulated that 15 percent of those sales (except for functions in which the hotel retained 15 percent of the gratuity) was split equally among the various employees working the function. We interpret this to mean that if more than one waiter worked a function, his individual tip rate would be less than 15 percent of the total sale. It is also unclear whether busboys received a portion of this 15 percent from the hotel, or, as petitioner's testimony suggests, received a percentage of the waiters' tips. Given this ambiguity, we do not consider functions, tour, and group gratuities when evaluating the waiters' tip rate.↩
10. Respondent used the 35-percent figure for the Lagoon Room and 30 percent for the Flame Room.↩
11. Respondent points out that petitioner admitted that he did not know exactly what tips waiters received, but that busboys figured on a 10-percent tip to waiters, of which they received 15 percent. (This calculation equaled a $ 1 tip to waiters per person served, based on an average $ 10 meal per person.) While we have found that the tip received by waiters more nearly equaled 13.5 to 14 percent, we think that our increasing the tip rate from waiters to 22 percent, infra,↩ covers any low estimate by petitioner. 12. The record does not disclose the frequency with which petitioner worked for these two waiters.↩
13. Petitioner testified that a busboy working in the Flame Room would occasionally be sent home early because business would be so slow. How often this occurred and whether the remaining busboys, working for more waiters, would have to stay later the record does not show.↩